**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

SEMKA MUSIC,

    Plaintiff,

vs.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

    Defendant.

No. 16-CV-2049-LRR

**REPORT AND RECOMMENDATION**

    The claimant, Semka Music (claimant), seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits, under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. (Act). Claimant contends that the Administrative Law Judge (ALJ) erred in determining that she was not disabled.

    For the reasons that follow, I recommend the District Court reverse and remand the Commissioner's decision.

### I.    BACKGROUND

    Claimant was born on October 25, 1974, in Bosnia, and was 37 years old at the time of her alleged disability onset date. (AR 12-21, 29, 53).[1] Claimant completed eight years of schooling in Bosnia, and finished her G.E.D. in the United States. (AR 30). At the time of the ALJ hearing, claimant testified that she was married with four children

---

[1] "AR" refers to the administrative record below.

(ages 22, 21, 14, and one-month old); and she resided with her one-month old child, her spouse, and her sister and her sister's husband and their 21 year-old son. (AR 30). Claimant has worked as a cook in a gas station, sanding cabinets, as a textile worker, cook, meat packer, housekeeper and an Avon sales person. (AR 31-35).

On June 12, 2012, claimant filed an application for disability benefits, alleging disability beginning December 21, 2011. (AR 157). Claimant claimed she was disabled due to lupus. (AR 206).

On August 22, 2012, the Commissioner denied claimant's application (AR 91-94), and on November 20, 2012, denied her request for reconsideration. (AR 96-99). On December 11, 2013, an ALJ convened a video hearing at which claimant and a vocational expert testified. (AR 11-21). On January 9, 2015, the ALJ found claimant was not disabled. (*Id.*). On March 22, 2016, the Appeals Council affirmed the ALJ's finding. (AR 1-4). The ALJ's decision, thus, became the final decision of the Commissioner. 20 C.F.R. § 404.981.

On May 19, 2016, claimant filed a complaint in this court. (Doc. 3). The parties have briefed the issues, and on December 28, 2016, this case was deemed fully submitted. (Doc. 16). On the same day, the Honorable Linda R. Reade, Chief United States District Court Judge, referred this case to me for a Report and Recommendation.

## II. *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. An individual has a disability when, due to his/her physical or mental impairments, he/she "is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled. 20 C.F.R. § 404.1566(c)(1)-(8).

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. "Substantial" activity involves significant mental or physical activities. 20 C.F.R. § 404.1572(a). "Gainful" activity is work done for pay or profit, even if the claimant does not ultimately receive pay or profit. 20 C.F.R. § 404.1572(b).

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and mental impairments. If the impairments are not severe, then the claimant is not disabled. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to perform basic work activities. *Kirby*, 500 F.3d at 707.

The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-

workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education, and work experience. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of his past relevant work. If the claimant can still do his past relevant work, then he is considered not disabled. Past relevant work is any work the claimant performed within the past fifteen years of his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation omitted). The RFC is based on all relevant medical and other evidence. The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Id*. If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. The Commissioner must show not only that the claimant's RFC will allow him or her to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584,

4

591 (8th Cir. 2004). If the claimant can make the adjustment, then the Commissioner will find the claimant not disabled. At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence of a disability. The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III. THE ALJ'S FINDINGS

The ALJ engaged in the five-step sequential analysis outlined above, as reflected in her written decision.

At Step One, the ALJ found claimant had not engaged in substantial gainful activity since December 21, 2011, the date of alleged onset of disability. (AR 14).

At Step Two, the ALJ determined claimant had severe systemic lupus erythematosus. The ALJ found claimant had four other medically determinable physical impairments that were not "severe" within the meaning of the Commissioner's Regulations: a cut on her arm with an episode of cellulitis, a vitamin D deficiency, gestational anemia, and a history of pneumonia. (AR 14).

At Step Three, the ALJ determined claimant did not have an impairment or a combination of impairments which met or medically equaled the severity of a listed impairment in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. (AR 15).

At Step Four, the ALJ determined claimant's RFC. The ALJ found claimant had the RFC to perform a range of light work as defined in 20 C.F.R. § 404.1567(b). The ALJ determined claimant could: (1) lift and/or carry and push and/or pull twenty pounds occasionally, ten pounds frequently; (2) stand and/or walk, with normal breaks, for a total of six hours in a workday; (3) sit, with normal breaks, for a total of six hours in a workday; (4) balance, crouch, stoop, kneel, crawl, and climb occasionally. (AR 15). The ALJ found claimant could not work in environments with concentrated exposure to

cold. (*Id.*). Based on this RFC assessment, the ALJ determined claimant was capable of performing past relevant work as a sewing machine operator and as a screen printer. (AR 19). Accordingly, the ALJ found claimant was not disabled and so did not reach Step Five.

## IV.   THE SUBSTANTIAL EVIDENCE STANDARD

A court must affirm the Commissioner's decision "'if the ALJ's decision is supported by substantial evidence in the record as a whole." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008)); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence" is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Wright*, 542 F.3d at 852 (quoting *Juszczyk*, 542 F.3d at 631). The Eighth Circuit Court of Appeals has explained the standard as "something less than the weight of the evidence and allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (internal quotation omitted).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but we do not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (internal citation omitted). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining

6

whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (quoting *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "simply because some evidence may support the opposite conclusion." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (internal quotation marks and citation omitted). *See also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion." (internal citation omitted)).

## V. DISCUSSION

Claimant argues the ALJ's decision is flawed for two reasons:

A. The ALJ erred in not giving controlling or at least great weight to the disability determination of treating rheumatologist Dr. Claro Palma.

7

B. The ALJ improperly discounted claimant's subjective allegations.

I will address these arguments separately below.

### A. The ALJ Erred in Not Giving Controlling or Great Weight to the Opinion of the Treating Rheumatologist

In arriving at her decision, the ALJ gave "little weight to the opinion of treating source Claro T. Palma, M.D.," claimant's rheumatologist. (AR 18). On December 6, 2013, Dr. Palma opined that claimant's restrictions included standing and walking no more than two hours a day, lifting less than ten pounds frequently and up to twenty pounds occasionally, needing four or more absences a month, and needing unscheduled absences. (AR 663-67). In affording Dr. Palma little weight, the ALJ noted that "claimant only experienced one documented lupus flare since the alleged onset date of disability . . . [and] claimant's chronic use of Prednisone [to treat the lupus flares] was discontinued shortly after the alleged onset date of disability, thus indicating her lupus generally was better controlled with immunosuppressant medication than it was prior to the date she stopped working full-time." (AR 18). The ALJ therefore found Dr. Palma's opinion "unreasonable." (*Id.*). The ALJ also concluded that the "clinical findings noted by Dr. Palma in the Medical Source Statement are not objectively documented in the medical evidence from the relevant period." (*Id.*). Finally, the ALJ noted that Dr. Palma "submitted his opinions as answers to a form questionnaire" and the ALJ cited case law for the proposition that "form reports in which the source's only obligation is to fill in a blank or check a box are entitled to less weight in the adjudicative process." (AR 19).

Generally, it is for an ALJ to determine the weight to be afforded to the opinions of medical professionals, and "to resolve disagreements among physicians." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (quotation omitted). In assessing the

medical opinions, however, ALJs should afford the opinion of a treating medical source more weight because a treating source is likely to be in the best position to provide a detailed, longitudinal picture of a claimant's impairments and may bring a unique perspective to the medical evidence that "cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2); *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *See Papesh*, 786 F.3d at 1132; *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). Even if an ALJ does not afford the treating source's opinion controlling weight, an ALJ must apply certain factors—(1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) the specialization of the treating source—in determining what weight to give the opinion. *See* 20 C.F.R. 404.1527(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Regardless, an ALJ must always give good reasons for the weight given the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Anderson*, 696 F.3d at 793. Pursuant to that provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 61 Fed. Reg. 34490–01, 34492 (July 2, 1996); *Wilson*, 378 F.3d at 544.

An ALJ may, however, "disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of

9

such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citing *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997) and *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir.1996)) (internal quotations omitted). *See also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (holding that an ALJ must give "substantial weight" to a treating physician, but may discount that weight if the opinion is inconsistent with other medical evidence). An ALJ may consider state agency physicians' opinions and may rely upon them in making her findings. *See* 20 C.F.R. § 404.1527(e)(2)(i); *see also Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (holding that it is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment).

Neither the ALJ, nor the Commissioner, dispute that Dr. Palma is a "treating" source. 20 C.F.R. § 404.1502. Turning to the factors the ALJ should consider in assessing the weight to afford a treating source, Dr. Palma is a specialist as a rheumatologist. Dr. Palma had a long-term relationship with claimant, first seeing her in 2001. (AR 209). Dr. Palma saw claimant eleven times between 2001 and his opinion in 2013. (AR 384, 390, 396, 402, 408, 504, 628, 634, 640, 646, 668). Dr. Palma concluded claimant met the diagnostic criteria for systemic lupus erythematosus, which is consistent with the ALJ's conclusion that claimant's lupus erythematosus was a severe impairment. (AR 14, 663). Clinical findings, symptoms and objective signs supporting the lupus diagnosis included cardiopulmonary involvement shown by pleuritic or pericarditis and lab testing. (AR 663-64). Dr. Palma was unsure as to how often claimant would require breaks, but when they were needed, he opined that claimant would need to sit quietly for 15 minutes before returning to work. (AR 665). Ultimately, Dr. Palma concluded claimant would be off task due to her lupus affecting her attention and concentration to the extent she could not perform even simple work tasks for about five percent of the workday. (AR 667). Dr. Palma did conclude that claimant was capable

of low stress work. (*Id.*). Finally, Dr. Palma opined that, on average, claimant would miss more than four days per month. (*Id.*). The medical record includes medically acceptable clinical and laboratory diagnostic techniques consistent with and supportive of Dr. Palma's opinions. Dr. Palma stated claimant demonstrated cardiopulmonary involvement shown by pleuritis or pericarditis. (AR 663). The record supports a showing of pleuritis. In July 2011, claimant was seen in the Emergency Department for pleuritic chest pain. (AR 330-31). In July 2014, claimant returned to the Emergency Department for pleuritic pain. (AR 865-66). Treatment notes consistently reflect a history of pneumonitis. (*See*, *e.g.*, AR 384, 390, 396, 402, 408, 628, 640, 646, 668, 678, 714, 737, 792).

As noted, the ALJ concluded that Dr. Palma's opinion was inconsistent with the medical records because the ALJ determined "claimant only experienced one documented lupus flare since the alleged onset date of disability . . . and claimant's chronic use of Prednisone [to treat the lupus flares] was discontinued shortly after the alleged onset date of disability," which was December 21, 2011. (AR 18). The evidence in the record is unclear in this regard, but I find it is "not inconsistent" with Dr. Palma's opinion. The record reflects that claimant completed a burst and taper of Prednisone in June 2011, indicative of a flare up as Prednisone was used to treat claimant's lupus. (*See* AR 297, 330, 336). In June 2013, claimant called Dr. Palma's office because of a lupus flare. (AR 583). Near the end of July, the record reflects a short course of Prednisone and a possible flare. (AR 640). On July 24, 2013, follow-up examination, Dr. Palma notes his diagnosis of "rule out flare" (AR 640) which the Commissioner interprets as "Dr. Palma sa[ying] plaintiff had a possible lupus flare. (Doc. 15, at 7). In March 2014, claimant had a flare with chest pain. (AR 668). Dr. Palma noted on March 19, 2014, that claimant "is having recent flare [sic]." (*Id.*). In July 2014, claimant returned to the

11

Emergency Department and was started on Prednisone. (AR 865, 871, 873). This evidence is not inconsistent with Dr. Palma's statement that claimant had periodic flares of her lupus.

Regarding the ALJ's conclusion that claimant's chronic use of Prednisone was discontinued shortly after the alleged onset date of disability, the record does not support this conclusion. In June 2011, claimant was on Prednisone and it was being tapered off. (AR 297). In July 2011, she again was on Prednisone. (AR 330, 336, 396). Claimant was on Prednisone in September 2011. (AR 294, 370). In January 2012, claimant remained on Prednisone. (AR 390). It appears she continued on Prednisone until early May 2012; because later in May the record reflects she experienced aches and pain that Dr. Palma believed may have been related to steroid withdrawal. (AR 384). In July 2012, treatment records reflect "confirmed" use of Prednisone. (AR 471). That month, claimant was taken off Prednisone and she stayed off Prednisone due to pregnancy. (AR 459, 504, 634). By July 2013, claimant was back on Prednisone. (AR 640). By November 2013, she had been off Prednisone for one month, though it is not clear when she resumed Prednisone. (AR 628). Similarly, in March 2014, the records reflect claimant had been off Prednisone for one month, but Dr. Palma restarted her on Prednisone again. (AR 668). In July 2014, claimant went to the Emergency Room and was started on Prednisone. (AR 865, 871, 873). From September 2014 to January 2015, the record repeatedly reflects the use of Prednisone. (AR 827, 845, 865, 878). Thus, although it is true that claimant was off Prednisone while pregnant, and occasionally at other times, she was generally on Prednisone most of the relevant time period. The ALJ's assertion that claimant's chronic use of Prednisone was discontinued shortly after the onset of disability is simply inconsistent with the record. In contrast, the medical record is not inconsistent with Dr. Palma's opinion.

The ALJ also gave little weight to Dr. Palma's restrictions due to his use of a "checkbox" form, citing cases indicating such opinions are entitled to less weight. (AR 19). In *O'Leary v. Schweiker*, 710 F. 2d 1334, 1341 (8th Cir. 1983), the court concluded an examining consulting physician's opinion was entitled to less weight because he used a checkbox form. Dr. Palma was a treating physician, however. Where an ALJ rejects a treating physician's opinion only because it appears as part of a checkbox form, the ALJ must still give good reasons for rejecting those opinions. *Miller v. Colvin*, No. C13-2028, 2014 WL 1779480, at *12 (N.D. Iowa May 5, 2014). A reviewing court must consider what, if any, explanation is given for the treating physician's conclusions. *See Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014). Here, Dr. Palma included several handwritten comments on the form, such as:

- Other diagnoses included a history of pleural effusion, pneumonitis, restrictive lung disease, and mediastinal adenopathy. (AR 663).
- Possible side effects of Prednisone included dizziness, indigestion, or nausea. Possible side effects of Azathioprine were mild nausea and vomiting. (AR 664).
- Claimant's lupus was a chronic condition punctuated by flares. (AR 665).
- "Lupus flares are unpredictable under the best circumstances, even with treatment, but can go into remission." (AR 667).

In contrast to giving "little weight" to the physician who treated claimant for more than a decade, the ALJ gave "great weight" to the opinions of the non-examining state agency medical consultants. (AR 18). The ALJ asserted the consultants based their opinions "upon comprehensive reviews of the record." (AR 18). Their review was far from comprehensive, however. The consultants reviewed claimant's case in August and November 2012. (AR 53-61, 63-72, 73-82). The most recent record cited was from August 2012, about eight months after claimant became disabled. (AR 79-80). The

consultants did not review almost 400 pages of medical records covering some 27 months from August 2012 until the ALJ's decision in January 2015. (AR 18, 516-914). The Commissioner is right that "[t]he mere fact that additional evidence becomes available after state agency medical experts issue their opinions does not render them unreliable." (Doc. 15, at 10). Here, however, the question is not whether the opinions are unreliable. The question is whether the ALJ erred in giving those opinions "great weight" and the opinion of claimant's treating physician "little weight." Under these circumstances, the opinions of the non-examining state agency medical consultants cannot constitute substantial evidence in support of the ALJ's conclusions, and do not trump the opinion of a treating physician. *See Willcockson v. Astrue*, 540 F.3d 878, 879-80 (8th Cir. 2008) (remanded, in part, due to 17 month gap from time of nonexamining state agency consultant's opinion to date of hearing).

In short, the ALJ erred in affording the opinion of claimant's long-term treating specialist little weight because that opinion was not inconsistent with the record. Rather, the ALJ's factual conclusions about claimant's single lupus flare up and discontinuation by claimant of her chronic use of Prednisone appears to be inconsistent with the record.

This error is not harmless. Claimant's residual functional capacity, as found by the ALJ, was:

> *[T]he claimant had a residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b). The claimant can lift and/or carry and push and/or pull twenty pounds occasionally, ten pounds frequently. She can stand and/or walk, with normal breaks, for a total of six hours in a workday. She can sit, with normal breaks, for a total of six hours in a workday. The claimant can balance, crouch, stoop, kneel, crawl, and climb occasionally. She cannot work in environments with concentrated exposure to cold.*

(AR 15). This contrasts significantly with Dr. Palma's limitations. Dr. Palma found claimant could stand and walk less than two hours a day, needed unscheduled breaks during the day, and should avoid even moderate exposure to fumes, odors, gases, dust and chemicals and avoid all exposure to cigarette smoke, soldering fluxes and solvents/cleaners; the ALJ imposed no such limitations. According to Dr. Palma, claimant was capable of low stress work, while the ALJ imposed no limitations related to stress. Finally, Dr. Palma concluded claimant would miss more than four days per month; the ALJ did not include any anticipated absences.

The vocational expert's testimony demonstrated that these differences are material. The vocational expert testified that "unscheduled work breaks of up to 15 minutes" requiring the hypothetical individual to sit quietly, "a couple times a week" precluded the jobs identified. (AR 48). She also opined that missing work four times a month precluded competitive employment. (AR 49). The vocational expert also testified that missing work due to lupus flares lasting "a week or two weeks periodically during a work year" precluded competitive employment. (*Id.*).

I find the ALJ erred in not giving controlling or at least great weight to Dr. Palma's opinion, and that had the ALJ given greater weight to Dr. Palma's opinion, it would have an impact on claimant's RFC. Therefore, I recommend the District Court reverse the ALJ's decision and remand and this matter for further consideration of this opinion.

### B. The ALJ's Credibility Determination

Because claimant's first argument requires reversal and remand, there may be no requirement for the Court to evaluate her second argument that the ALJ erred in assessing claimant's credibility. Nevertheless, should the District Court disagree with my

recommendation on the first issue, the Court may need to address the second issue. Accordingly, I will address claimant's second argument as well.

Claimant argues the ALJ erred in discounting her credibility regarding the severity of her symptoms. (Doc. 14, at 13-17). The ALJ found "claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely credible." (AR 16). The ALJ concluded there were "substantial inconsistencies" in her complaints. (AR 17). For example, the ALJ noted that during a time claimant alleged she was disabled, she also collected unemployment benefits. (*Id.*). These benefits require claimants to assert their ability to work. (*Id.*). The ALJ also noted that claimant provided inconsistent statements as to why she lost her last job. (*Id.*). The ALJ also found claimant's daily living activities inconsistent with the severity of her reported symptoms. (*Id.*). Finally, the ALJ remarked that "[a]lthough the claimant reported she could not sit still" and "would need a break every ten to fifteen minutes," the ALJ observed that during the 45-minute hearing, claimant was "hardly . . . moving" and did not need a break. (*Id.*).

A court reviews an ALJ's credibility determination through an examination of the *Polaski* factors and the mandates of SSR 14-1p. Under the *Polaski* factors, an ALJ must consider the "claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). SSR 14-1p provides the following guidance on credibility determinations:

> IV. How do we evaluate a person's statements about his or her symptoms and functional limitations? Generally, we follow a two-step process:

> A. First step of the symptom-evaluation process. There must be medical signs and findings that show the person has an MDI(s) which we could reasonably expect to produce the fatigue or other symptoms alleged. If we find that a person has an MDI that we could reasonably expect to produce the alleged symptoms, the first step of our two-step process for evaluating symptoms is satisfied.
>
> B. Second step of the symptom-evaluation process. After finding that the MDI could reasonably be expected to produce the alleged symptoms, we evaluate the intensity and persistence of the person's symptoms and determine the extent to which they limit the person's capacity for work. *If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities; medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.* We will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning. When we need additional information to assess the credibility of the individual's statements about symptoms and their effects, we will make every reasonable effort to obtain available information that could shed light on the credibility of the person's statements.

SSR 14-1p, 2014 WL 1371245 (Apr. 3, 2014), at *7 (emphasis added).

In *Lowe*, the Eighth Circuit Court of Appeals stated, "[t]he ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (internal citation omitted). If the ALJ gives a good reason for discrediting a claimant's credibility, then the court will defer to the ALJ's judgment "even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001). "Although the ALJ may disbelieve a claimant's allegations of pain, credibility determinations must be supported by substantial evidence." *Jeffery v. Sec'y of Health & Human Servs.*, 849 F.2d 1129, 1132 (8th Cir. 1988) (internal

17

citation omitted). "Moreover, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead him to reject the claimant's complaints." *Id.* "Where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider all evidence relevant to those complaints." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal citation omitted). In evaluating a claimant's subjective complaints of pain, an ALJ may rely on a combination of his personal observations and a review of the record to reject such complaints. *Lamp v. Astrue,* 531 F.3d 629, 632 (8th Cir. 2008). However, the ALJ may not solely rely on his personal observations to reject such claims. *Id.* "Subjective complaints can be discounted [by the ALJ], however, where inconsistencies appear in the record as a whole." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (citing *Polaski*).

Claimant takes issue with the ALJ's findings. For example, claimant notes that sometimes the State of Iowa pays unemployment benefits for training programs. (Doc. 14, at 14). But claimant does not allege she was in a training program and there is no evidence in this record to suggest she was. The ALJ was permitted to consider the apparent inconsistency of claimant's receipt of unemployment benefits and her claim of being unemployable. *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) (finding claimant's collection of unemployment benefits during the period of her claimed disability reinforced the ALJ's conclusion that the claimant exaggerated the severity of her impairment). Claimant cites cases where courts have criticized ALJs for finding claimants not disabled because they could engage in some daily activities. (Doc. 14, at 14-15). But the ALJ here only considered claimant's daily activities for the purpose of assessing her credibility; she did not use claimant's daily activities as a means of discounting medical evidence. *Wagner v. Astrue*, 499 F.3d 842, 851-52 (8th Cir. 2007)

(noting that although a claimant need not be bedridden to be disabled, an ALJ may take into account the degree to which a claimant's daily activities are inconsistent with the alleged severity of impairments). Similarly, claimant cites cases critical of ALJs for applying a "sit and squirm" test on claimants. (Doc. 14, at 16). But ALJs are nevertheless permitted to take into account their own observations of a claimant in reaching a credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."). This is not a situation, as in *Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001), where the ALJ's personal observations were dispositive of the outcome.

In short, although another ALJ or the Court may reach a different credibility finding, I find there is substantial evidence in the record as a whole to support the ALJ's credibility findings in this case. Where an ALJ gives good reason for discrediting a claimant's testimony, a reviewing court should defer to the ALJ's credibility findings. *Halverson v. Astrue*, 600 F.3d 922, 931-33 (8th Cir. 2010). Accordingly, I recommend the Court find the ALJ did not err in her credibility findings.

## VI. CONCLUSION

For the reasons set forth herein, I respectfully recommend the District Court **reverse and remand** for further consideration the Commissioner's determination that claimant was not disabled.

Parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of

the record forming the basis for the objections. *See* FED. R. CIV. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 9th day of March, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa